UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

MICHAEL R. COOPER,

                Plaintiff,

v.                                           Case No. 18-cv-407-pp

LADONNA JONES,
and JOHN AND JANE DOES,

                Defendants.

---

**ORDER DENYING PLAINTIFF'S MOTIONS FOR SUMMARY JUDGEMNT (DKT. NOS. 27, 44), GRANTING PLAINTIFF'S REQUEST TO DISMISS DOE DEFENDANTS (DKT. NO. 45), GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 34) AND DISMISSING CASE**

---

The plaintiff is a Wisconsin state inmate representing himself. Magistrate Judge William E. Duffin, the judge assigned when the plaintiff filed his amended complaint, screened the amended complaint and allowed the plaintiff to proceed against defendant Ladonna Jones (identified at that time as L. Johnson) on a claim that she retaliated against him and against John or Jane Doe defendants on claims related to withholding his mail. Dkt. No. 12 at 12–13. The plaintiff filed a motion for summary judgment well before the deadline, dkt. no. 27, and another motion after the deadline,[1] dkt. no. 44. Defendant Jones also moved for summary judgment. Dkt. No. 34.

---

[1] This court set a deadline of July 22, 2019 for filing dispositive motions. Dkt. No. 22. The plaintiff filed his second summary judgment motion on August 7, 2019—over two weeks after that deadline. Dkt. No. 44. The court could strike the motion as untimely. But the court notes that even though the defendant responded to the plaintiff's *first* motion for summary judgment, the plaintiff

1

## I. Procedural History—the Doe Defendants

The amended complaint named John/Jane Doe correctional officers. Dkt. No. 9 at 1. In his screening order, Judge Duffin allowed the plaintiff to proceed against the Doe defendants for "specific alleged violations of his First Amendment rights," having to do with the plaintiff's claim that the Doe defendants held his mail for over a month, preventing his family from getting the mail he was trying to send. Dkt. No. 12 at 5-6. In the screening order, Judge Duffin told the plaintiff that he would "need to find out the names of the Doe defendants and then file a motion to substitute them for the Doe placeholder." Id.

Judge Duffin issued that order on November 7, 2018. Id. This court set a discovery deadline of June 20, 2019. Dkt. No. 22. The plaintiff asked Judge Duffin to reconsider Judge Duffin's dismissal of some of his claims. Dkt. No. 13. He also sought leave to amend the complaint regarding his retaliation claim and to change a name of one of the actors from Lt. Carrol to Lt. Stadler, dkt. no. 23, as well as a request to add information to his claim against defendant Jones, dkt. no. 24. In the second motion, the plaintiff acknowledged that he'd received discovery and inspected it and acknowledged that Judge Duffin had

---

didn't file a reply in support of his motion. A review of the contents of the second motion indicates that the plaintiff may have meant for this second motion to function as a reply brief. The defendant has responded to the "Supplemental Proposed Findings of Fact" (Dkt. No. 47) that the plaintiff filed along with the second motion. Dkt. No. 50. The court will not strike the second motion, but will treat it as a reply brief, and will consider it and the facts filed with it (to the extent they are supported by admissible evidence) along with the plaintiff's first summary judgment motion.

instructed him to use discovery to learn the names of the Doe defendants and file a motion to substitute their names for the "Doe" placeholders. Dkt. No. 24 at 1, 3. The plaintiff filed these motions in March, months before the deadline for completing discovery. He also filed, months before the discovery deadline, a request for guidance when the court didn't rule on the other motions right away. Dkt. No. 26. In none of these motions did he identify the Doe defendants or ask to substitute their names.

The court denied those motions, explaining that (1) the plaintiff had failed to comply with Civil Local Rule 15, which requires a party seeking to amend a pleading to include the proposed amended pleading with the motion and (2) some of the information the plaintiff wanted to present in an amended complaint (such as the names of witnesses) wasn't necessary. Dkt. No. 33 at 3–4. The court also explained the process for filing a motion for leave to file an amended complaint. Id. at 4-5. The plaintiff never did so.

Despite filing his motion for summary judgment more than a month before the discovery deadline closed, and more than two months before the summary judgment deadline, the plaintiff did not address his claim against the Does or identify them. Dkt. Nos. 27, 28.

In the second summary judgment he filed on August 7, 2019 (which the court construes as a reply brief in support of his original motion), the plaintiff *did* address the Doe defendants. He asked the court to "dismiss without prejudice Defendant(s) John/Jane Does and those claims against those

defendants." Dkt. No. 45 at 1. The court will grant that request, and will dismiss the Doe defendants.

**II. Facts**

The plaintiff has been incarcerated at the Milwaukee County Jail on several occasions. Dkt. No. 36 at ¶13. Relative to this case, the plaintiff was incarcerated at the jail from February 22, 2017 to October 19, 2018. Id.; see also Dkt. No. 47 at ¶1. The defendant worked as a corrections officer ("CO") at the jail during this time. Dkt. No. 36 at ¶14. The defendant says that she does not recall the plaintiff. Id. at ¶15.

Candice Anderson, who is not a defendant, started working in the jail in February 2017 and began operating her own housing unit in April 2017 after going through training. Id. at ¶22. James Novotny, who is also not a defendant, is a lieutenant in the Internal Affairs Department at the Milwaukee County Sheriff's Department. Id. at ¶25. Brian Stadler, also not a defendant, worked as a lieutenant in Jail during the relevant time. Id. at ¶26.

A. Background Information

Inmates get a copy of the Inmate Handbook after being booked into the jail. Id. at ¶29. The handbook provides general housing unit rules and identifies the types of discipline officials can impose if an inmate fails to follow jail rules. Id. at ¶30. The handbook includes each existing rule, "so that inmates are well aware of what is expected of them." Id. at ¶31. Officials also post the pod rules on the walls of each pod and verbally inform inmates of their

4

expectations, more than once, during their shifts.[2] Id. at ¶32. Failure to obey a direct order given by an officer, whether an order to clean a cell or any other order, is a Category I minor rule violation that "is subject to an in-pod lock-in for up to 23 hours within the inmate's cell." Id. at ¶41.

The handbook also includes a section about grievances. Id. at ¶34. Inmates file grievances against officers almost daily. Id. at ¶33. In June 2017, the time the incident underlying this lawsuit took place, inmates could turn in their grievances to officers or directly to supervisors. Id. at ¶51; see also Dkt. No. 47 at ¶44.

The defendant was assigned to work first shift on Friday, June 23, 2017 and Saturday, June 24, 2017. Dkt. No. 36 at ¶36. She worked as a field training officer in pod 5C, training CO Marla Hall (not a defendant). Id. First shift is from approximately 6:00 a.m. to approximately 2:30 p.m. Id. at ¶37. Pod 5C is a general housing unit for inmates who are presumed to be staying at the jail for a longer length of time and who do not have any type of mail restriction. Id. ¶40.

During first shift, officers attend roll call when they arrive. Id. at ¶ 42. They then go to their assigned areas where the third shift officers debrief them on any incidents worth noting. Id. The officers then begin their shift tasks,

---

[2] In his response to the defendant's proposed findings of fact, the plaintiff disputed this fact, asserting that he didn't receive a handbook, that there were no pod rules posted on the pod walls and that officers did not communicate verbal expectations. Dkt. No. 46 at ¶¶30–32. He also stated in his supplemental findings of fact that he never received a handbook. Dkt. No. 47 at ¶45. The plaintiff did not present any evidence supporting these assertions.

5

which, in general time order, are: 1) conduct a body count of each inmate; 2) check that the cell doors are locked; 3) open the pod around 6:45 a.m., which includes instructing inmates to wake up, get dressed, turn on their lights, and line up outside their cells so officers can conduct an official wristband check;[3] 4) relay the housing unit rules (including no fighting and general inmate expectations); 5) conduct breakfast service and allow inmates to eat in the dayroom; 6) order inmates back into their cells after breakfast to clean their cells; 7) re-open the dayroom for inmates to engage in conversation, watch television, and access the telephones;[4] 8) conduct scheduled cell inspections every 30 minutes; and 9) conduct at least one or two random cell inspections. Id. at ¶43.

On first shift, the day room is typically closed while medication is distributed to inmates, during the officer's break around 11:00 a.m., and again before the 2:30 p.m. shift completion. Id. at ¶46. First shift officers are also expected to distribute mail to the inmates while the dayroom is open. Id. at ¶47. If the officers do not distribute mail during first shift, they alert their supervisors and the second shift officers. Id. at ¶48.

As the jail receives mail, employees review it for contraband and give it to third shift officers to enter into each inmate's file. Id. at ¶52. The plaintiff did

---

[3] A wristband check involves inspecting each inmate's wristband to ensure that the photo on the wristband matches the inmate. Dkt. No. 46 at ¶44. Officers also make sure that "every inmate is clothed, beds are made, etc." Id.

[4] The dayroom is a large room filled with numerous tables and chairs, telephones and televisions. Dkt. No. 36 at ¶45.

not have any mail entered for him from June 15 through July 13, 2017, which means that the post office did not deliver any mail to the Jail addressed to the plaintiff. Id. at ¶53.

   1.   *June 23–25, 2017*

On June 23, 2017, breakfast service ended at approximately 7:57 a.m. and cell cleaning began around 7:59 a.m. Id. at ¶57. There is no reference in the jail log as to whether or when mail was distributed to inmates during first shift on June 23. Id. at ¶58. There's also no record that a supervisor was informed about the mail not being distributed. Dkt. No. 47 at ¶50. However, the jail log contains an 8:09 p.m. entry that employees distributed the mail to the inmates in pod 5C. Dkt. No. 36 at ¶62.

At his deposition, the plaintiff testified that he saw mail on the CO desk at around 9:00 a.m. on June 23, 2017. Id. at ¶102. He questioned the defendant as to why she wasn't distributing the mail. Id.; Dkt. No. 47 at ¶3. The defendant told the plaintiff to get away from the desk and that she would distribute the mail "when [she felt] like it." Dkt. No. 47 at ¶4. The plaintiff says that the defendant also told CO Hall (not a defendant), "You don't have to pass out the mail just because 'they' want you to." Id. at ¶5.

The plaintiff immediately asked for a grievance form. Dkt. No. 36 at ¶103. The plaintiff says that the defendant would not give him a form. Dkt. No. 47 at ¶7. During second shift, the plaintiff asked CO Cole (not a defendant) for two grievance forms and told Cole that he intended to file a grievance against

the defendant for not passing out the mail. Id. at ¶¶8–9. Cole was the one to pass out the mail during second shift. Id. at ¶10.

The plaintiff admitted he was not harmed by not having the mail passed out on first shift. Dkt. No. 36 at ¶104. He didn't know if the June 23, 2017 mail contained any mail for him and he had no knowledge that he would be receiving mail from any particular person that day. Id. at ¶¶105–106. When employees did pass out the mail during second shift, there was no mail from outside the prison for the plaintiff. Id. at ¶107.

On June 23, 2017, the plaintiff filed a grievance concerning the defendant; in the box for "Date/Time Submitted:," someone wrote "6.23.17 p.m." Id. at ¶60; see also Dkt. No. 41-2 at 1. This grievance alleged that the defendant, who was training another officer, refused to pass out the inmates' mail despite it being brought in with her on her shift. Dkt. No. 36 at ¶61; Dkt. No. 41-2 at 1. The plaintiff says that he placed "both grievances against [the defendant]" in the cell door; one was retuned as a copy for him with the initials of the staff member who picked it up. Dkt. No. 47 at ¶11.

The plaintiff says that the next day, June 24, 2017, he noticed the defendant and Hall preparing for first shift. Id. at ¶12. Upon opening all the cell doors, the officers conducted wristband checks. Id. at ¶13. The plaintiff says that after breakfast, the defendant walked up to his cell (which he was occupying) and closed the door. Id. at ¶14. He explains that thirty to forty-five minutes later, the plaintiff noticed other inmates in the dayroom and recreation

areas. Id. at ¶15. An unidentified inmate asked the defendant to open the plaintiff's cell door at the plaintiff's request. Id. at ¶16.

The defendant says that what happened on June 24, 2017 is that the plaintiff received an in-pod lock-in at around 8:20 a.m. for disobeying an order to clean his cell. Dkt. No. 36 at ¶63. The plaintiff claims he did not violate a jail rule of an order from the defendant or Hall and that he didn't know that the jail rules required him to clean his cell each morning. Id. at ¶¶109–110. The defendant does not recall if she specifically ordered the plaintiff to lock into his cell or if Hall did so. Id. at ¶64. She also admits that she can't recall if the plaintiff's cell was dirty prior to the room confinement. Dkt. No. 47 at ¶46. Jail logs indicate that officers ordered two inmates to lock into their cells for a twenty-three-hour minor rule violation for "refusing to cell clean." Dkt. No. 36 at ¶65. According to the minor disciplinary entry for the plaintiff from June 24, he began his twenty-three-hour lock-in at 8:23 a.m., so he was scheduled to be released at 7:23 a.m. on June 25, 2017. Id. at ¶68. It's impossible to determine which officer wrote the June 24 report because of a data conversion fail that occurred when the jail switched record systems.[5] Id. at ¶69.

At some point—it isn't clear when—the plaintiff says a lieutenant came into the housing unit and "began engaging in jolly communication with" the

---

[5] In June 2017, the jail utilized a system called CJIS. Dkt. No. 36 at ¶54. In December 2017, the jail switched to a new system called CMS. Not all information converted. "CNV" notations on some jail documents signifies a data conversion fail. Data in the old CJIS system is now unavailable. Id. That "CNV" notation is in the spot where the reporting officer's name should be on the disciplinary report. Dkt. No. 41-3 at 1.

9

defendant. Dkt. No. 47 at ¶18. The plaintiff says he called out to the lieutenant but was ignored. Id. at ¶19. Sometime in the day, the defendant and Hall approached the plaintiff's cell and asked him if he wanted a food tray. Dkt. No. 47 at ¶20. The plaintiff told the defendant he wanted to speak to a supervisor, and, according to the plaintiff, the defendant slammed his cell door and stated, "Good luck with that." Id. at ¶¶21–22. At his deposition, the plaintiff testified that he did not know why he was being locked in on June 24, 2017 until he asked the second-shift housing officer, CO Anderson, for an explanation later that day. Dkt. No. 36 at ¶111. The plaintiff asked Anderson to speak with a supervisor, and she assured him that she would contact the lieutenant. Dkt. No. 47 at ¶27. The plaintiff says that he observed Anderson speaking with Lieutenant Stadler at the officers' desk. Id. at ¶28.

The defendant also worked in pod 5C on June 25, 2017; this time, she was field training Hall during the first shift. Dkt. No. 36 at ¶70. The plaintiff again saw the defendant and Hall preparing for first shift that morning. Dkt. No. 47 at ¶31. The plaintiff says that his cell door never opened "even though [his] 23 hour room confinement was over." Id. at ¶32. In the amended complaint, the plaintiff alleged that he was locked in for twenty-nine hours, dkt. no. 9 at 5; if the plaintiff was locked in for twenty-nine hours, he would have been released around 1:23 p.m. on the 25th.

On June 27, 2017, the plaintiff filed an inmate grievance about the lock-in, arguing that the defendant had locked him in in retaliation for filing a grievance about her failure to deliver mail. Dkt. No. 47 at ¶36; Dkt. No. 41-2 at

10

4. In this grievance, the plaintiff asserted that he had been locked in from 7:00 a.m. on June 24, 2017 through 6:00 p.m. on June 25, 2017—thirty-five hours. Dkt. No. 41-2 at 4. The plaintiff was told that the defendant would be given the opportunity to respond to his grievance.[6] Dkt. No. 47 at ¶37.

    2.    *Lieutenant Stadler*

Lieutenant Stadler worked as the second shift lieutenant in charge of the fifth and sixth floors of the jail on both June 24 and June 25, 2017. Dkt. No. 36 at ¶71. Specifically, Stadler was the lieutenant in charge of the fifth floor on June 24, 2017 (second shift) and June 25, 2017 (from 10:00 a.m. to 2:00 p.m.). Id. at ¶73. If any inmate, including the plaintiff, had complained about being unjustly locked in his cell, Stadler would have reviewed the computer system to determine why the inmate was locked in and communicated the reason to the inmate. Id. at ¶72. Stadler's review of the plaintiff's lock-in showed that it complied with the jail's rules and procedures. Id. at ¶74. Because Stadler found that the plaintiff's lock-in was justified (because he "disobeyed a verbal order of an officer, in direct violation of Rule 111 of the Jail"), he would have had no reason to alert his captain for investigation by Internal Affairs. Id. at ¶¶75–76.

Stadler says he has never told an inmate that another officer retaliated against him, or told an officer that a fellow officer retaliated against an inmate.

---

[6] The plaintiff describes conversations he had with other jail staff, letters he sent to the jail administration and responses he received, regarding the defendant having an opportunity to respond. Dkt. No. 47 at ¶¶38-42. Those communications are not relevant to the plaintiff's claim.

11

Id. at ¶¶89–90. The plaintiff says Stadler told another officer (Anderson), who in turn told the plaintiff, that the defendant had retaliated against the plaintiff. Dkt. No. 46 at ¶89; Dkt. No. 30 at ¶4. Stadler says, though, that he would have no way of knowing that an inmate filed a grievance against another officer unless the inmate gave that grievance to him. Dkt. No. 36 at ¶91. And Stadtler says that if any grievance had been turned in to him, he would not have told the subject officer about the substance of that grievance. Id. at ¶92.

   3.  *CO Anderson*

CO Anderson did not work on Friday, June 23, 2017 and was scheduled to work second shift on Saturday, June 24, 2017. Id. at ¶¶38–39. Because first and second shift officers' interactions overlap for only about thirty minutes, which includes roll call, id. at ¶78, Anderson would not have communicated with first shift officers beyond debriefing (which lasts five to ten minutes), id. at ¶79. The defendant never told Anderson that she retaliated against an inmate for writing a grievance about her. Id. at ¶80. If the defendant had done so, Anderson would have alerted a supervisor. Id. at ¶81. Anderson would not be privy to any grievances that the defendant reviewed unless she told Anderson. Id. at ¶82. Their shifts did not overlap enough for Anderson to observe the defendants' activities. Id.

If an inmate made a complaint to Anderson, whether about another officer or any other issue the inmate might be having, she would direct him to write a grievance so that a supervisor could review his concern. Id. at ¶83. If the inmate's complaint was that he'd been unjustly locked in his cell, she, like

12

Stadler, would review the computer system for the reason for the lock-in. Id. at ¶84. If the inmate was dissatisfied with Anderson's response, she would tell him to file a grievance so a supervisor could review his concerns. Id. at ¶85. Anderson says she never told any inmate that an officer retaliated against him, id. at ¶86, though the plaintiff says she did, dkt. no. 46 at ¶86; dkt. no. 30 at ¶4. According to the plaintiff's deposition testimony, Anderson told him "that Lieutenant Stadler said [the defendant] must have seen the grievance I wrote on her and retaliated." Dkt. No. 36 at ¶114.

Anderson points out that she would not have told the plaintiff that his lock-in was an act of retaliation for him filing a grievance because she would have no way of knowing that a grievance had been filed unless he turned it in to her. Dkt. No. 36 at ¶87. She wasn't scheduled to work on June 23, 2017—the day the plaintiff filed the grievance against the defendant about her failure to deliver mail—so she could not have been the officer to whom the plaintiff turned in the grievance. Id. at ¶¶ 38, 88. The plaintiff says Anderson knew about the grievance because she talked to Stadler about it. Id. at ¶¶112, 114–15.

If Anderson encountered inmates "with anything unusual," she would make a notation concerning that encounter in her daybook. Id. at ¶116. A daybook is a small notebook that Anderson keeps on her person for documentation purposes. Id. at ¶117. If an inmate had complained to Anderson that he or she was unjustly locked in and/or she believed any retaliation occurred, she would have made this notation in her daybook. Id. at

13

¶118. Anderson's daybook entries for June 24, 2017 do not have any reference to the plaintiff.[7] Id. at ¶119.

## III. Discussion

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be disputed or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

---

[7] Paragraphs 93 through 101 of the defendant's proposed findings of fact recount minor rule violations the plaintiff incurred in *2018*—the year *after* the incident at issue. Dkt. No. 36 at ¶¶93-101. The fact that the plaintiff incurred rule violations in the months *after* the events of June 23-25, 2017 is irrelevant, and the court has not included the details of these allegations or considered them in reaching its decision.

14

>  (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

> B. First Amendment Retaliation

To prove a retaliation claim, a plaintiff must show that he engaged in activities protected by the First Amendment, that he "suffered a deprivation that would likely deter First Amendment activity in the future[,]" and that the First Amendment activity was "at least a motivating factor" in the defendant's decision to take a retaliatory action. Bridges v. Gilbert, 557 F.3d 541, 546 (7th Cir. 2009) (quoting Woodruff v. Mason, 542 F.3d 545, 551 (7th Cir. 2008)).

The plaintiff alleges that he engaged in protected activity by filing a grievance against the defendant for not passing out the mail. Filing a grievance is a protected activity, but only if that grievance is not frivolous. Perez v. Fenoglio, 792 F.3d 768, 783 (7th Cir. 2015) (citing Thomson v. Washington, 362 F.3d 969, 971 (7th Cir.2004)). The plaintiff's grievance was frivolous for two reasons: first, there is no policy or rule that required the defendant to pass out the mail when the plaintiff said she should. In fact, jail policy, which the plaintiff attached to his brief, states that jail employees should distribute mail *within twenty-four hours* after it is delivered to the floor, barring unusual circumstances. Dkt. No. 45-1 at 32. The plaintiff asserted that he saw the mail

15

sitting on the defendant's desk around 9:00 a.m.; the jail log indicated that the mail was distributed shortly after 8:00 p.m., les than twelve hours later. While the plaintiff may not have been happy with the defendant's failure to pass out mail as soon he asked, he has not, and cannot, show that her failure to do so constituted a violation of jail policy or rules.

Second, the plaintiff has admitted that he suffered no harm from the delay in passing out mail. In fact, he didn't receive any mail that day, and apparently wasn't expecting any. Without harm, the plaintiff's grievance was frivolous. In Doyle v. Pasquino, 207 F. Appx. 713, 714–15 (7th Cir. 2006), the Seventh Circuit found that the grievances underlying the plaintiff's retaliation claim were frivolous. The court explained, "Since the facts Doyle pleaded show that he was not exercising a constitutionally protected right when he filed the grievances that allegedly triggered the defendants' retaliatory acts, his pleadings undermine the validity of his claim." The Seventh Circuit upheld the district court's decision to dismiss the claim. Id. at 715. Because frivolous grievances are not activity protected by the First Amendment, the plaintiff cannot show that his First Amendment rights were violated when the defendant put him on a twenty-three-hour lock-in.

Because the plaintiff has not established the first element of a First Amendment retaliation claim, the plaintiff is not entitled to judgment as a matter of law even if he and the defendant have genuine disputes on material issues. The court will deny the plaintiff's motions for summary judgment and will grant summary judgment in favor of the defendant.

**IV.    Conclusion**

The court **DENIES** the plaintiff's motions for summary judgment. Dkt. Nos. 27 and 44.

The court **GRANTS** the plaintiff's request to dismiss the Doe defendants. Dkt. No. 45.

The court **GRANTS** the defendant's motion for summary judgment. Dkt. No. 34.

The court **ORDERS** that this case is **DISMISSED with prejudice**. The court will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within 30 days of the entry of judgment. See Fed. R. of App. P. 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Fed. R. App. P. 4(a)(5)(A).

Under limited circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within 28 days of the entry of judgment. The court cannot extend this deadline. See Fed. R. Civ P. 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment.  The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin, this 13th day of March, 2020.

BY THE COURT:

_____
**HON. PAMELA PEPPER**
**Chief United States District Judge**